1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

MAYUR RAJENDRABHAI PATEL,

9                         Petitioner,

10           v.

11  U.S. DEPARTMENT OF HOMELAND
   SECURITY, et al.,

12                        Respondents.

13

Case No. C19-1864-RSL-MLP

REPORT AND RECOMMENDATION

14

15                           **I.      INTRODUCTION**

16           Petitioner, a native and citizen of India, brings this 28 U.S.C. § 2241 immigration habeas

action through counsel to challenge his expedited removal order and continued detention at the

17  Northwest ICE Processing Center ("NWIPC") in Tacoma, Washington.[1] (*See* Pet. (Dkt. # 1).)

18  The Court stayed his removal pending adjudication of his claims. (Dkt. # 3.) The Government

19  has filed a return memorandum and motion to dismiss. (MTD (Dkt. # 5).) Petitioner did not file

20  an opposition. Having considered the parties' submissions, the balance of the record, and the

21  governing law, the Court recommends that the Government's motion to dismiss be GRANTED,

22

23

---

[1] NWIPC was previously known as the Northwest Detention Center.

REPORT AND RECOMMENDATION - 1

1    Petitioner's habeas petition be DENIED, the stay of removal be VACATED, and this action be

2    DISMISSED with prejudice.

## II.    BACKGROUND

4        Just before midnight on August 14, 2019, Petitioner entered the United States without

5    inspection by crossing the U.S.-Canada border near Lynden, Washington. (Chan Decl. (Dkt. # 6),

6    Ex. A.) Less than 30 minutes later, a U.S. Customs and Border Patrol ("CBP") agent encountered

7    Petitioner and arrested him after determining that he entered the United States illegally. (*Id.*)

8    After being transported to the Bellingham Border Patrol Station, Petitioner alleged a fear of

9    returning to India. (*Id.*, Exs. A, B.) As a result, CBP processed him for expedited removal under

10    8 U.S.C. § 1225(b)(1) and referred him for an interview with a U.S. Citizenship and Immigration

11    Services ("USCIS") asylum officer ("AO") to determine whether he had a credible fear of

12    persecution. (*Id.*, Ex. A.) CBP also served him with Form I-867, a copy of his sworn statement

13    (*id.*, Ex. B); Form I-860, Notice and Order of Expedited Removal (*id.*, Ex. C); Form I-296,

14    Notice to Alien Ordered Removed/Departure Verification (*id.*, Ex. D); and Form M-444,

15    Information about Credible Fear Interview (*id.*, Ex. E). An interpreter read Forms I-867 and M-

16    444 to Petitioner in Hindi, and Petitioner acknowledged understanding the documents. (*Id.*, Ex.

17    A at 3, Ex. B.) Shortly thereafter, CBP transferred Petitioner to U.S. Immigration and Customs

18    Enforcement ("ICE") custody at the NWIPC. (Pet. at ¶ 11.)

19        On October 23, 2019, an AO from USCIS's San Francisco Asylum Office conducted a

20    credible fear interview with Petitioner. (Chan Decl., Ex. H.)[2] Prior to the interview, Petitioner

21    received a list of pro bono legal service providers for the Tacoma Immigration Court. (*Id.*, Ex.

22    F.) The AO conducted the interview over the telephone in his best language, Gujarati, through an

23

---

[2] The AO's Pre-Screening Interview Notes are not a verbatim recording of the interview but provide the AO's contemporaneous account of the questions and answers. (*See* Chan Decl., Ex. H at 1.)

1   interpreter. (*Id.*, Ex. H at 1.) Petitioner confirmed he could understand the interpreter, had read

2   and understood Form M-444 describing the credible fear interview process, and wanted to

3   continue the interview without an attorney or consultant present. (*Id.* at 1-2.) The AO then placed

4   Petitioner under oath. (*Id.* at 2.)

5          The AO questioned Petitioner about his credible fear claim. When the AO asked who he

6   was afraid would harm him in India, Petitioner stated that his uncle "tried to harm me, but with

7   my good luck, I survived." (*Id.*) Petitioner reported that when his father was diagnosed with

8   cancer approximately two years ago, his uncle asked for 500,000 Indian rupees to pay for his

9   father's surgery, and then took his father to a doctor who charged only 100,000 Indian rupees;

10  Petitioner's uncle said his father did not need chemotherapy, and his father died seven months

11  later due to a lack of treatment. (*Id.* at 5.) Petitioner explained that after his father passed away,

12  his father's property was supposed to go to him, but his uncle was planning to take the property

13  and "due to that, he was trying to harm me." (*Id.* at 2.) The AO asked whether there was any

14  other reason Petitioner's uncle wanted to harm him, and Petitioner responded that his uncle did

15  not like his father or his father's children. (*Id.* at 3.) Petitioner indicated that his father was a

16  farmer whose income stayed in their village, and his uncle "wished that if my father doesn't stay

17  alive, he wanted to take all the property, including the land" because he "was a Congress party

18  person, he had connections in Congress." (*Id.*) Petitioner also said his "father supported [the]

19  BJP party, which my uncle also didn't like." (*Id.*) Petitioner stated that he did not currently

20  support any particular party and that he and his uncle did not discuss his political affiliation. (*Id.*)

21  Petitioner further stated that his family was not well-known in the community. (*Id.*)

22         The AO then asked whether Petitioner's uncle ever threatened or harmed him. (*Id.*)

23  Petitioner responded that his uncle lives in Ahmedabad and has connections with the "[Member

of the Legislative Assembly ("MLA")] of the district of Mansa," and that the MLA's son also did not like Petitioner's family. (*Id.*) When asked why the MLA's family did not like his family, Petitioner responded, "I don't know, it's possible that the father doesn't like you, so the son doesn't like you, either." (*Id.*) Petitioner stated that the MLA was helping his uncle. (*Id.* at 6.) When asked whether the MLA's family ever threatened or harmed him, he responded that in August and October 2018, "unknown people tried to get me into a car and didn't say anything." (*Id.* at 4.) Petitioner explained that while he attended college, an "attack happened right outside of my college, [but] because lots of [people] were present, they were not able to harm me." (*Id.* at 3.) When asked who "they" were, Petitioner did not know. (*Id.* at 4.) When asked how Petitioner knew "they" intended to harm him, he stated: "These people came in the car and they were coming where I was standing, other people were on the motorcycle, the people in the car had hockey sticks with them, they tried to forcefully make me sit in the car, but I was unable to get into the car." (*Id.*) The AO then asked Petitioner how he knew "they" knew his uncle, and he responded, "[B]ecause it never happened to me before and they found out I enrolled myself into the college and then this happened." (*Id.*)

Petitioner also claimed that after October 9, 2018, his uncle asked him to stop attending college and began locking him in a warehouse store room for periods of time, the longest of which was four days. (*Id.* at 4-5.) Petitioner stated he did not know why his uncle did this. (*Id.*)

The AO asked Petitioner whether he feared anyone in India other than his uncle and his uncle's associates, and Petitioner responded that he feared the Congress party because his uncle has a connection to the party. (*Id.* at 5.) The AO also asked whether there was any reason other than Petitioner's inheritance that his uncle would harm him, and he responded: "There is no particular reason, my uncle can harm me for no reason, too." (*Id.*)

REPORT AND RECOMMENDATION - 4

1    The AO next asked about Petitioner's belief of future persecution or torture if he returned

2    to India. (*Id.* at 5.) Petitioner stated that his uncle has a "big circle and he will find out if I'm

3    back in India and I'm afraid he might kill me." (*Id.*) The AO asked whether Petitioner could

4    move to a different area in India and be safe. (*Id.*) Petitioner responded that he tried to go to

5    Rajasthan and Maharashtra, but his uncle found him and brought him back to Gujarat. (*Id.*) He

6    claimed his uncle discovered his "digital IDs" and tracked him using his "Aadhaar card and SIM

7    card," but he did not know how the Aadhaar card could be used in that manner. (*Id* at 5-6.)

8    At the end of the interview, the AO summarized Petitioner's claim as follows:

9    I fear returning to India because I could be killed by my uncle or his associates. My
     father was diagnosed with cancer and my uncle asked for 500,000 Indian rupees for
10   his surgery. We gave this to my uncle, but my father's surgery cost only 100,000
     and then my father died about 7 months later. My father left property to me, and
11   my uncle wants it to use with other Congress party members. On two occasions
     after this, a group of people tried to get me into a car but they did not say anything.
12   I tried to leave the area and I went to two different states, but my uncle was able to
     find me. I was taken back to Gujarat and my uncle would keep me locked in a room
13   for days at a time, with the longest time period being about 4 days. I don't think the
     police would help because my uncle is connected to an MLA who I believe protects
14   him.

15   (*Id.* at 8.) Petitioner agreed that this was a correct summary of his testimony. (*Id.*)

16   On September 7, 2019, Petitioner received Form I-869, Record of Negative Credible Fear

17   Finding. (*Id.*, Ex. I.) The form indicated that the AO determined Petitioner had not established a

18   credible fear of persecution in India because "[t]here is no significant possibility that you could

19   establish in a full hearing that the harm you experienced and/or the harm you fear is on account

20   of your race, religion, nationality, political opinion, or membership in a particular social group."

21   (*Id.*) The AO also determined that Petitioner had not established a credible fear of torture in India

22   because he had not established there was a significant possibility that the "harm you fear would

23   be inflicted by or at the instigation of, or with the consent or acquiescence of, a public official or

1  other person acting in an official capacity." (*Id.*) An interpreter read the form to Petitioner over

2  the telephone. (*Id.*)

3        Petitioner requested that an immigration judge ("IJ") review the AO's decision. (*Id.*; *see*

4  *also id.*, Ex. J.) Prior to the credible fear review hearing ("Review Hearing"), Petitioner was

5  served with Form I-863, Notice of Referral to Immigration Judge (*id.*, Ex. J); Form I-870,

6  Record of Determination/Credible Fear Worksheet (*id.*, Ex. G); the Credible Fear Determination

7  Checklist, an internal document explaining the basis for the AO's negative credible fear finding

8  (*id.*, Ex. K); the AO's Credible Fear Asylum Pre-Screening Interview Notes (*id.*, Ex. H); Form I-

9  860, Notice and Order of Expedited Removal (*id.*, Ex. C); and Form I-867, Record of Sworn

10  Statement (*id.*, Ex. B).

11        On September 17, 2019, Petitioner appeared for his Review Hearing where he was

12  represented by counsel. (*Id.*, Exs. L, M, N.)[3] A Gujarati interpreter appeared telephonically. (*Id.*,

13  Ex. N.) Petitioner testified that his uncle wanted to take over his father's land because he wanted

14  a permanent position in the Congress party. (*Id.*) Petitioner stated that his uncle hired Congress

15  party members. (*Id.*) Petitioner also testified that he could not go to college and was confined at

16  home. (*Id.*) Petitioner's attorney submitted an affidavit from Petitioner's mother intending to

17  better explain what happened in India. (*Id.*) According to Petitioner's attorney, the affidavit

18  stated that Petitioner's uncle had been delivering death threats to his father and attempting to

19  acquire the property before his father's death. (*Id.*) Petitioner's attorney also pointed to the

20  political differences between his uncle and his father as adding to the danger Petitioner faced.

21  (*Id.*) Without explaining her reasoning, the IJ affirmed the AO's determination. (*Id.*)

22  Specifically, the IJ found that Petitioner had not established a significant possibility that he

23

---

[3] Exhibit N is an audio recording of the Review Hearing.

1   would be persecuted on the basis of his race, religion, nationality, membership in a particular

2   social group, or because of his political opinion. (*Id.*, Ex. L.) The IJ further found that Petitioner

3   had not established a significant possibility that he would be intentionally subjected to serious

4   physical or mental harm inflicted by, or at the instigation of, or with the consent or acquiescence

5   of, a government official or other person acting in an official capacity. (*Id.*) Accordingly, the IJ

6   returned the case to the U.S. Department of Homeland Security ("DHS") for removal. (*Id.*)

7          On November 18, 2019, Petitioner initiated the instant action and filed a motion seeking a

8   stay of removal, which the Court granted. (Dkt. ## 1-3.) In his habeas petition, he seeks to

9   challenge he procedures that led to the issuance of the expedited removal against him, as well as

10  his continued detention. (Pet. at 2.) He alleges that his Fourth and Fifth Amendment rights were

11  violated "in disregard of substantive and procedural due process" (*id.*) and that he was ordered

12  removed without a "meaningful opportunity to demonstrate that [he] is being held pursuant to the

13  erroneous application or interpretation of relevant law" (*id.* (quoting *Boumediene v. Bush*, 553

14  U.S. 723, 779 (2008))). Petitioner alleges that there is no reasonable basis for the AO's negative

15  credible fear determination. (*Id.* at 5.) He also claims that the AO "impermissibly placed the

16  burden of proof regarding internal relocation on [him]," failed to engage in any individualized

17  analysis regarding internal relocation, and failed to address the potential harm Congress party

18  members or other local authorities might inflict upon him in a new state. (*Id.* at 5-7.) He alleges

19  that he experienced persecution at the hands of the government and therefore was entitled to a

20  presumption of country-wide persecution. (*Id.* at 8.) He claims that the AO's "conclusions, and

21  the methods by which they were reached, fly in the face of asylum law and the law regarding

22  relief available under Article 3 of the U.N. Convention Against Torture [("CAT")]." (*Id.*)

23

1    Petitioner also complains that the AO engaged in no analysis. (*Id.*) As relief, he seeks a correctly

2    conducted credible fear review proceedings and release on bond. (*Id.* at 8-9.)

3         The Government timely moved to dismiss and vacate the stay of removal. (*See generally*

4    MTD.) Petitioner did not file a response.

### III.    DISCUSSION

### A.    Expedited Removal Proceedings

7         There is no dispute that Petitioner is an "applicant for admission"—a noncitizen who

8    "arrive[d] in the United States," or is "present" in the United States but has "not been admitted."

9    8 U.S.C. § 1225(a)(1). An applicant for admission who is unable to affirmatively show, to the

10   satisfaction of an immigration officer, that he or she "has been physically present in the United

11   States continuously for the 2-year period immediately prior to the date of the determination of

12   inadmissibility," 8 U.S.C. § 1225(b)(1)(A)(iii)(II), is generally subject to an expedited removal

13   process that does not include a hearing before an IJ or review of the removal order, 8 U.S.C. §

14   1225(b)(1)(A)(i). If, however, the noncitizen "indicates either an intention to apply for asylum

15   . . . or a fear of persecution," the inspecting immigration officer must refer the noncitizen for an

16   interview with an AO. 8 U.S.C. § 1225(b)(1)(A)(ii); *see also* 8 C.F.R. §§ 235.3(b)(4), 208.30(d).

17        The AO interviews the noncitizen, reviews relevant facts, and determines whether the

18   noncitizen has a credible fear. *See* 8 U.S.C. § 1225(b)(1)(B); 8 C.F.R. § 208.30. The purpose of

19   the interview is to "elicit all relevant and useful information bearing on whether the applicant has

20   a credible fear of persecution or torture." 8 C.F.R. § 208.30(d). The AO must conduct the

21   interview in a nonadversarial manner and in a language chosen by the noncitizen. 8 C.F.R. §§

22   208.30(d), (d)(5). At the time of the interview, the AO must verify that the noncitizen has

23   received Form M-444, Information about Credible Fear Interview in Expedited Removal Cases,

1    and understands the credible fear determination process. 8 C.F.R. § 208.30(d)(2). The noncitizen

2    may present evidence and consult with any person of his or her choosing prior to the interview,

3    at no expense to the government, so long as it does not unreasonably delay the process, and any

4    person with whom the noncitizen consults may be present at the interview. 8 C.F.R. §

5    208.30(d)(4). The AO must create a summary of the material facts presented by the noncitizen. 8

6    C.F.R. § 208.30(d)(6). At the end of the interview, the officer must review the summary with the

7    noncitizen and give him or her an opportunity to correct any errors. *Id.*

8         A credible fear of persecution or torture is established where there is a "significant

9    possibility," taking into account the credibility of the noncitizen's testimony and other facts

10   known to the AO, that the noncitizen could establish eligibility for asylum under 8 U.S.C. §

11   1158, withholding of removal under 8 U.S.C. § 1231(b)(3), or withholding or deferral of removal

12   under the Convention Against Torture. 8 C.F.R. §§ 208.30(e)(2), (3); *see* 8 U.S.C. §

13   1225(b)(1)(B)(v). The noncitizen's testimony may be sufficient to sustain his or her burden of

14   proof if it is "credible, is persuasive, and refers to specific facts sufficient to demonstrate that the

15   applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii) (credibility standard applicable under 8

16   U.S.C. § 1225(b)(1)(B)(v)).

17        After the interview, the AO must create "a written record of his or her determination,

18   including a summary of the material facts as stated by the applicant, any additional facts relied

19   on by the officer, and the officer's determination of whether, in light of such facts, the

20   [noncitizen] has established a credible fear of persecution or torture." 8 C.F.R. § 208.30(e)(1);

21   *see* 8 U.S.C. § 1225(b)(1)(B)(iii)(II). A supervisory AO must review the determination before

22   USCIS issues it. *See* 8 C.F.R. §§ 208.30(e)(7), 235.3(b)(2), (b)(7).

23        If the AO determines that the noncitizen has a credible fear of persecution, the noncitizen

"shall be detained for further consideration of the application for asylum." 8 U.S.C. §
1225(b)(1)(B)(ii). If the officer determines that the noncitizen does not have a credible fear of
persecution, the officer shall order the noncitizen "removed from the United States without
further hearing or review," unless the noncitizen requests review by an IJ. 8 U.S.C. §§
1225(b)(1)(B)(iii)(I), (III). Review by an IJ is de novo and must include an opportunity for the
noncitizen to be heard and questioned by the IJ, who also may take into evidence any relevant
oral or written statement. 8 U.S.C. § 1225(b)(1)(B)(iii)(III); 8 C.F.R. §§ 1003.42(c), (d). The
noncitizen may consult with a person of his or her choosing prior to the review, at no expense to
the government and so long as it does not "unreasonably delay the process." 8 U.S.C. §
1225(b)(1)(B)(iv); *see* 8 C.F.R. § 1003.42(c). The review hearing "shall be concluded as
expeditiously as possible, to the maximum extent practicable within 24 hours, but in no case later
than 7 days after the date of the determination . . . ." 8 U.S.C. § 1225(b)(1)(B)(iii)(III); *see* 8
C.F.R. § 1003.42(e). If the IJ determines that the noncitizen does not have a credible fear of
persecution or torture, the IJ affirms the AO's determination and remands the case to DHS for
execution of the expedited removal order. 8 C.F.R. § 1003.42(f) ("No appeal shall lie from a
review of an adverse credible fear determination made by an immigration judge.").

Any noncitizen subject to these provisions "shall be detained pending a final
determination of credible fear of persecution and, if found not to have such a fear, until
removed." 8 U.S.C. § 1225(b)(1)(B)(iii)(IV).

### B.    Judicial Review of Expedited Removal Orders

Congress has limited juridical review of expedited removal orders: "Without regard to the
nature of the action or claim and without regard to the identity of the party or parties bringing the
action, no court may . . . enter declaratory, injunctive, or other equitable relief in any action

pertaining to an order to exclude [a noncitizen] in accordance with section 1225(b)(1) of this title except as specifically authorized in [8 U.S.C. § 1252(e)] . . . ." 8 U.S.C. § 1252(e)(1)(A).

Section 1252(e)(2) permits judicial review of expedited removal orders through habeas proceedings but limits review to determinations of:

> (A) whether the petitioner is [a noncitizen],
>
> (B) whether the petitioner was ordered removed under [§ 1225(b)(1)], and
>
> (C) whether the petitioner can prove by a preponderance of the evidence that the petitioner is [a noncitizen] lawfully admitted for permanent residence . . . .

8 U.S.C. § 1252(e)(2); *see* 8 U.S.C. § 1252(a)(2)(A) (limiting judicial review of expedited removal orders to the exceptions provided in § 1252(e)).[4] The scope of the inquiry allowed under § 1252(e)(2)(B) is "limited to whether such an order in fact was issued and whether it relates to the petitioner. There shall be no review of whether the [noncitizen] is actually inadmissible or entitled to any relief from removal." 8 U.S.C. § 1252(e)(5). If a violation is found, the only allowable relief is a removal hearing pursuant to 8 U.S.C. § 1229a. 8 U.S.C. § 1252(e)(4)(B).

Section 1252(e)(3), titled "Challenges on validity of the system," limits jurisdiction as follows:

> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of—
>
> (i) whether such section, or any regulation issued to implement such section, is constitutional; or
>
> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this

---

[4] In addition, the Ninth Circuit has allowed due process claims collaterally attacking expedited removal orders in criminal cases where the noncitizen is charged with criminal reentry. *Pena v. Lynch*, 815 F.3d 452, 455-56 (9th Cir. 2015); *United States v. Raya-Vaca*, 771 F.3d 1195, 1202-1207 (9th Cir. 2014). This exception is "strictly limited" to criminal reentry cases, *Pena*, 815 F.3d at 456, and therefore it is inapplicable here.

1    subchapter or is otherwise in violation of law.

2    8 U.S.C. § 1252(e)(3)(A); *see United States v. Barajas-Alvarado*, 655 F.3d 1077, 1086 n.10 (9th

3    Cir. 2011) (declining to address "general attacks on the expedited removal process" because they

4    were barred by § 1252(e)(3)); *Li v. Eddy*, 259 F.3d 1132, 1136 (9th Cir. 2001) ("systemic

5    challenges are to be filed in the District of Columbia, and within 60 days of promulgation of the

6    expedited removal procedures"), *vacated as moot*, 324 F.3d 1109 (9th Cir. 2001).[5]

7         In *Thuraissigiam v. U.S. Department of Homeland Security*, 917 F.3d 1097 (9th Cir.

8    2019), *cert. granted*, 2019 WL 5281289 (Oct. 18, 2019), the Ninth Circuit held that § 1252(e)(2)

9    violates the Suspension Clause. The petitioner sought to challenge the procedures leading to his

10   expedited removal order, including that the AO and IJ on review "failed to elicit all relevant and

11   useful information" bearing on whether he had a credible fear of persecution or torture, and

12   "failed to consider relevant country conditions evidence." *Id.* at 1102. The core of his claim was

13   that "the government failed to follow the required procedures and apply the correct legal

14   standards when evaluating his credible fear claim." *Id.* at 1116. The district court dismissed for

15   lack of subject matter jurisdiction. *Id.* at 1102. The Ninth Circuit reversed, concluding that §

16   1252(e)(2) did not authorize jurisdiction over the petitioner's claims but that the Suspension

17   Clause required him to have a "meaningful opportunity to demonstrate that he is being held

18   pursuant to 'the erroneous application or interpretation' of relevant law." *Id.* at 1100 (quoting

19   *Boumediene v. Bush*, 553 U.S. 723, 779 (2008) (quoting *INS v. St. Cyr*, 533 U.S. 289, 302

20   (2001))). The court did not decide "what right or rights [the petitioner] may vindicate via use of

21

22

23   ---
     [5] *See Garcia de Rincon v. Dep't of Homeland Sec.*, 539 F.3d 1133, 1141 n.4 (9th Cir. 2008) (although "*Li* was vacated on mootness grounds . . . the case is analytically sound").

the writ," but remanded to the district court to exercise jurisdiction over the petitioner's "legal

challenges to the procedures leading to his expedited removal order."[6] *Id.* at 1119.

### C.    Petitioner's Claims

Petitioner states that he brings this action to challenge the procedures that led to his

expedited removal order. (Pet. at 2.) He claims (1) the Government violated his Fourth and Fifth

Amendment rights, including substantive and procedural due process; (2) the Government

ordered him removed without giving him a meaningful opportunity to demonstrate eligibility for

asylum; (3) there was no reasonable basis for the AO's negative credible fear determination; (4)

the AO improperly conducted the relocation analysis; (5) the AO's conclusions and methods

violate asylum law and the CAT; (6) the IJ engaged in no analysis; and (7) he is entitled to

release. (*See generally* Pet.) As explained below, none of these arguments are availing.

Petitioner's first two claims are wholly conclusory. Because he does not explain how his

Fourth or Fifth Amendment rights were violated, or why he did not have a meaningful

opportunity to demonstrate eligibility for asylum in light of his credible fear interview and

Review Hearing, he has not shown that he is entitled to habeas relief on these claims.

Petitioner's third claim regarding the basis for the AO's decision fails for two reasons.

First, to the extent Petitioner challenges the merits of the AO's decision, rather than the

procedures leading to that decision, *Thuraissigiam* does not provide a basis for the Court's

jurisdiction. *See Thuraissigiam*, 917 F.3d at 1117 n.20, 1119 n.24 (expressly stating that the

court did not consider whether the Suspension Clause requires judicial review of the merits of

the credible fear determination or factual challenges to an expedited removal order); *Patel v. U.S.*

---

[6] The Ninth Circuit expressly stated that it did not consider whether the Suspension Clause requires judicial review of the merits of the credible fear determination or factual challenges to an expedited removal order. *Thuraissigiam*, 917 F.3d at 1117 n.20, 1119 n.24.

*Dep't of Homeland Sec.*, No. 19-1690, 2020 WL 1067833, at *7 (W.D. Wash. Feb. 13, 2020), *R & R adopted*, 2020 WL 1062943 (W.D. Wash. Mar. 5, 2020) ("*Thuraissigiam* did not establish that the Suspension Clause requires judicial review of the merits of a credible fear determination."); *Lopez-Mendoza v. Barr*, No. 19-1448, 2019 WL 6710861, at *5 (C.D. Cal. Sept. 11, 2019) (finding no jurisdiction under *Thuraissigiam* to consider challenges to an IJ's factual determinations or to reweigh the evidence).

Second, to the extent the Court has jurisdiction to consider the claim, the AO provided a reasonable explanation for the decision. (Chan. Decl., Ex. K.) On the Credible Fear Determination Checklist, the AO explained that Petitioner did not establish past persecution because the events Petitioner described did not occur because of his race, religion, nationality, membership in a particular social group, or political opinion. (*Id.* at 2.) Rather, Petitioner's uncle and associates targeted him because he had inherited property that his uncle wanted for the Congress party. (*Id.*) The AO reasoned:

> First, while the applicant's uncle wanted the property for the Congress party, applicant's own political opinion was not a central reason for his harm. Applicant testified that he has not strongly supported any party in the past but has considered joining the BJP party. However, applicant did not present sufficient testimony that this was one reason for applicant's harm. Next, the particular social group of immediate family members of applicant's father is not a cognizable social group because applicant testified that his family is not well-known in the community. Thus, harm on this basis will not be explored. There is no evidence that the applicant was harmed because of actual or imputed possession of race, religion, nationality, political opinion, or membership in any particular social group.

(*Id.*) The AO also found no evidence that Petitioner would be harmed in the future based on a protected category. (*Id.*) As to torture, the AO found that Petitioner fears death, as his uncle has been targeting him, which would constitute severe physical or mental pain or suffering. (*Id.* at 3.) However, the AO also found that Petitioner did not demonstrate that "the feared harm would be inflicted by or at the instigation of, or with the consent of acquiescence of, a public official

REPORT AND RECOMMENDATION - 14

acting in an official capacity." (*Id.*) The AO acknowledged Petitioner's testimony that his uncle has a connection to a MLA but concluded that Petitioner "did not demonstrate that the government would play any role" if his uncle harmed him. (*Id.*) The AO also recognized Petitioner's testimony that his uncle was arrested following a fight and then quickly released, but concluded that this was not sufficient to meet the standard for harm by the government. (*Id.*) Based on the foregoing, the Court concludes that the AO had a reasonable basis for the negative credible fear determination.

Petitioner's fourth claim regarding relocation analysis fails because the AO did not base the negative credible fear determination on Petitioner's ability to relocate within India; therefore, relocation analysis is irrelevant in this case. Petitioner's fifth claim regarding the AO's conclusions and methods is wholly conclusory, like his first two claims, and fails for the same reason. As to the sixth claim regarding the IJ's analysis, Petitioner fails to explain why this is a violation of his rights or cite any statute or regulation requiring the IJ provide an explanation. The IJ reviewed the evidence, including the AO's Credible Fear Determination Checklist, heard Petitioner's testimony, and affirmed the AO's determination. Petitioner fails to establish any error entitling him to habeas relief.

Finally, Petitioner's request for release should be denied. The expedited removal statute provides for mandatory detention until Petitioner is removed. 8 U.S.C. § 1225(b)(1)(B)(iii)(IV); *see Ms. L. v. U.S. Imm. & Customs Enforcement*, 302 F. Supp. 3d 1149, 1159 n.3 (S.D. Cal. 2018) ("Individuals in the expedited removal process who have not been found to have a 'credible fear of persecution' for asylum purposes are subject to mandatory detention."). Under the statute and regulations, Petitioner may be released only if he is granted parole, i.e., released under narrowly prescribed circumstances, such as "urgent humanitarian reasons or significant

public benefit[,]" 8 U.S.C. § 1182(d)(5)(A), medical emergency, or a "legitimate law enforcement objective," 8 C.F.R. § 235.3(b)(2)(iii). In addition, due process requires a bond hearing only when § 1225(b) detention becomes "unreasonably prolonged." *Banda v. McAllenan*, 385 F. Supp. 3d 1099, 1106 (W.D. Wash. 2019). To determine whether detention has become unreasonably prolonged, the Court must conduct a case-specific analysis that considers: "(1) the total length of detention to date; (2) the likely duration of future detention; (3) the conditions of detention; (4) delays in the removal proceedings caused by the detainee; (5) delays in the removal proceedings cause by the government; and (6) the likelihood that the removal proceedings will result in a final order of removal." *Id.* (quoted source omitted). Having considered all these factors, the Court concludes that Petitioner's detention, which has lasted for approximately six months and is likely to end with his removal shortly after this case is dismissed, is not unreasonably prolonged and does not violate his Fourth or Fifth Amendment rights, as he alleges.

## IV.    CONCLUSION

The Court recommends that the Government's motion to dismiss (dkt. # 5) be GRANTED, Petitioner's habeas petition (dkt. # 1) be DENIED, the stay of removal (dkt. # 3) be VACATED, and this action be DISMISSED with prejudice. A proposed order accompanies this Report and Recommendation.

Objections to this Report and Recommendation, if any, should be filed with the Clerk and served upon all parties to this suit within **fourteen (14) days** of the date on which this Report and Recommendation is signed. Failure to file objections within the specified time may affect your right to appeal. Objections should be noted for consideration on the District Judge's motions calendar for the third Friday after they are filed. Responses to objections may be filed within

1    **fourteen (14) days** after service of objections. If no timely objections are filed, the matter will be

2    ready for consideration by the District Judge on **April 10, 2020**.

3          Dated this 23rd day of March, 2020.

4    _____

5    MICHELLE L. PETERSON
     United States Magistrate Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

REPORT AND RECOMMENDATION - 17